T. F. GRIFFIN, Appellant, v. M. E. BROWN, CORA NESBIT BROWN, W. G. MERTEN and MERTEN CONSTRUCTION CO., Appellee.

**Boundaries:** TITLE BY ADVERSE POSSESSION. Title by adverse possession cannot be acquired by mere occupancy; the possession must have been taken with the intention of asserting title. Where the intention in taking possession was to occupy only up to the true line, no occupancy beyond the line would be adverse. Thus the purchaser of one half a lot intending to claim simply to the boundary line, but in fact occupying a strip beyond the line, acquired no title to the additional strip, though occupied for the statutory period.

**Same:** ACQUIESCENCE: EVIDENCE. One party cannot acquiesce in a line established by himself alone and bind the other party by such acquiscence, though acting in good faith and believing it to be the true boundary. The establishment of the line and possession thereto must be with the knowledge of the other party and his assent thereto. Evidence held insufficient to establish a boundary line by

acquiescence of the parties, and also insufficient to establish owner-
ship of the adjacent tract.

*Appeal from Woodbury District Court.*—HON. GEORGE JEP-
SON, Judge.

MONDAY, DECEMBER 14, 1914.

ACTION to restrain the defendant from trespassing on
plaintiff's land, and to ascertain and fix the true boundary
line between the two parties. The opinion states the facts.
—*Affirmed.*

*Sam Page,* for appellant.

*E. J. Statson* and *Alfred Pizey,* for appellees.

GAYNOR, J.—On the 13th day of October, 1899, the plain-
tiff purchased and still owns a piece of land which is described
as follows: The south forty feet of lot 1, in block 9, in Hig-
man's addition to Sioux City. It appears that immediately
after the purchase he took possession, had the same surveyed,
and boundary lines pointed out; that thereafter he constructed
a dwelling house on the portion of the lot so purchased, sowed
the same to blue grass, and planted thereon certain trees; that
this portion of lot 1 faced on Pierce street, which runs north
and south; that the lot was on the west side of Pierce street
facing the street; that, soon after he purchased it, he planted
trees along the south line of his lot, or rather near what he
claims to be the south line of his lot; that he has used, culti-
vated, and occupied the above lot during all of the time since
he purchased it, and up to the line now claimed by him. It
appears that on the 20th day of October, 1905, the defendant
M. E. Brown purchased the north fifty-five feet of lot 2 in the
same block; that the north line of the tract purchased by
Brown is the south line of the tract owned by the plaintiff;
that the defendant M. E. Brown continued to own this north
fifty-five feet of lot 2, adjoining plaintiff's land on the south
until December 21, 1912, when he conveyed the same to his
wife, Cora Nisbit Brown, the other defendant; that immedi-

ately after purchasing this defendant M. E. Brown had this fifty-five feet surveyed and stakes placed to mark the location of the line as he claimed it to be; that he erected a house on his land in the winter of 1906 and 1907. This house was on the south part and on the rear end of his lot. It appears that there was no fence built between the land claimed by the plaintiff and the land claimed by the defendant. It appears that defendant's land was unoccupied by any one up to 1906 and 1907. It appears that the defendant M. E. Brown purchased this fifty-five feet through one W. L. Frost, a land agent, we take it, and the deed was made by one E. F. Leland, dated October 20, 1905. There is no showing, in this record, as to the source of Leland's title. There is no showing as to where Leland lived, or what his business was, or that he ever saw the land in controversy. There is no claim that Leland or the defendant Brown ever consented to plaintiff's line as claimed by him. It appears that, at the time this action was commenced, the defendants were erecting a building near the north line of their lot, and that in so doing they got over the line claimed by the plaintiff as the true boundary line.

Plaintiff brings this action against all the defendants, to enjoin them from trespassing on his land in the erection of said building, and prays a decree of court fixing the south boundary line of his premises at the point claimed by him. Plaintiff in his petition alleged that he improved and cultivated his tract of land, erected buildings and planted fruit and shade trees thereon, and marked the southwest corner of his ground by planting an elm tree there, and marked the south boundary line by placing a row of trees along the south line of the tract; that he cultivated, occupied, and held open, public, and notorious possession of his tract up to the boundary line so fixed and established by him; that the owners of the property now claimed by the defendant recognized this as the true boundary of appellant's property for a period of more than thirteen years; that he occupied it, under actual claim of right, title, and ownership thereto, for the past thir-

teen years, and his possession was adverse to that of defendants and their grantors. The defendants make certain claims against the plaintiff in their answer, which we do not consider here, for the reason that there is a conflict in the evidence as to these matters, and we do not deem them of controlling importance in the disposition of this case. The defendant admits plaintiff's ownership of the south forty feet of lot 1, claims ownership to the north fifty-five feet of lot 2, denies plaintiff's right to have the line fixed at the point claimed by him, and alleges that the line is farther north, or, in other words, that the line fixed by the plaintiff extended over and upon defendant's property. The controversy here is as to the true boundary line between these two lots, whether the same be established by acquiescence of the parties or by the adverse occupancy of the plaintiff. Upon the issues thus tendered, the court entered a decree for the defendants, dismissing plaintiff's petition. Plaintiff appeals.

The plaintiff was called as a witness in his own behalf. He testified as to the facts hereinbefore set out, the fact of purchase, the fact of having his land surveyed at the time of the purchase, the fact of having the lines pointed out to him, the fact of having made actual measurement, and the fact that he planted trees along his south boundary line, a few inches to the north of the line fixed by him. He testified, in substance, as follows:

'Higman's addition is platted into quarter blocks, and in order to fix my boundary line I measured this quarter block at least twice, and had an engineer once. This was done about the time I built my house. My father and I also measured it. The party on the north of me seemed to think our measurements were not correct. To be correct, I got a surveyor, and they got a surveyor. It was surveyed, at that time, at least four times.' At the time of this survey, I made a permanent mark on my southern boundary line. My measurements and that of the engineer correspond to the inch. We placed a stake at the alley corner. The alley was on the west. I placed also a stake at the southwest corner, near the curb line of Pierce street. I also put a post about six feet high just in from the

alley near the stake. That post stayed there for years. I also planted trees the following spring. I had an elm tree planted on the southwest corner. It was planted about four inches from my lot line. I planted it there, so when it grew it would still be on my land. I planted some fruit and shade trees along the south line, a trifle on my side. We determined the south boundary line by drawing a line between the two stakes which I had set out. At that time, the owner of the south lot, the one now owned by the defendant, was a man by the name of McNeil. The title to the property stood in W. J. Flanagan, who was in the employ of McNeil. I had a talk with McNeil, the owner of the lot to the south, with reference to the grading of the two lots. I talked with McNeil about putting the dirt on his lot. He said it was all right. I told him about having the lot surveyed and fixing the boundary lines and placing a post there and the trees. Mr. McNeil said it was satisfactory to him. Then I graded down my lot and placed the surplus earth on the south lot. I called Mr. Mc-Neil's attention to the stake I had placed to mark the corner. The trees, when I set them out, were about the size of a whip-lash. Some of those trees died. I did not know where the line was before I measured it. I undertook to establish my south line where the engineer told me to. I had no intention of claiming anything except as showed me by the survey. It was my intention to fix the line by the description contained in the deed. My intention was to fix the boundary line with the owner of the property on the south of me, and occupy the same to that point.

He was then asked this question:

'To what point? A. To the point of the boundary line as fixed and agreed upon with the owner of the lot to the south and by the survey of the surveyor.' 'I never, to my knowl-edge, claimed to a point beyond the line described in the deed. I have not claimed the present line through mistake or misap-prehension of the line. I did not make a mistake.' 'I meas-ured and agreed with the owner of the lot on the south as to the line.'

To the testimony of the plaintiff, as to his talks with McNeil and as to McNeil's being the owner of this south lot, and as to McNeil's agreeing to the line claimed by the plain-

tiff, the defendant duly objected, and objected to all conversations or agreements made by the plaintiff with McNeil touching this line, unless it was shown that McNeil was then the owner of the land. This case being in equity, the court reserved its ruling upon this evidence. Thereupon the plaintiff called one Flanagan, who testified that he was in the grain business with Ware & Leland; that he knew McNeil when he lived in Sioux City; that McNeil was in the grain business; that he was McNeil's bookkeeper. He said that he recalled the occasion when the plaintiff came to him and inquired as to the ownership of the lot south of the plaintiff's land. He was then asked this question:

'Do you know who at that time actually owned this lot (meaning the lot now owned by defendant)?' To which defendants objected as not being the best evidence of the ownership of the lot. 'A. C. G. McNeil. Q. Do you know? A. I was under the supposition that he did. Q. Do you know whether he did own it at that time? A. No. Q. You say you did not know whether he owned it or not; that you do not know. A. Yes. Q. Who did own it?' Defendant objects. 'A. C. G. McNeil owned it.' Defendants moved to strike the answer out, as not the best evidence. 'Q. How did it happen that the record title was in you? A. That I cannot answer. I don't know. Q. At whose request was it put in your name?' Objected to as before. 'A. At C. G. McNeil's request. When the plaintiff asked for the owner of this lot, I sent him to Mr. McNeil to discuss the matter.'

This is all the plaintiff's testimony. Thereupon the defendants called one G. Y. Skeels, who testified that he was a civil engineer; that he made two surveys for the defendant of the north fifty-five feet of block 2; that he made the first survey six or seven years ago in the summer.

I fixed the north line of his land according to my survey. The north line of the fifty-five feet owned by the defendant is the center of the block. There is no alley in that block. My starting point was on Sixteenth street, and I located the exact center line of the block north and south, and drove an oak stake at each end of the line. Recently I again surveyed the block for the purpose of fixing this line. We found the

old stake in there, and measured through to the block as originally. We found one stake there in exactly the center of the block. I found a stake at the west end of the lot, which seemed to be an old stake that had been there for a number of years, six or seven. It was a surveyor's stake, two inches square at the top and slightly below the surface. I made a plat of this north fifty-five feet, showing my location of the line and the location of the trees and buildings on the north fifty-five feet.

Here we set out the plat referred to by the witness.

It is a correct representation of the location of the trees along the line and the distances from the house. The westerly tree is the alley tree. It is one foot nine inches from the south line of the tree to my line. The next is a plum tree, which is one foot four and one-half inches. The third is a plum tree, which is one foot. The fourth is a box elder one foot five and one-half inches south of my line. The westerly one from the foundation is two feet one inch from the line. The chimney, which is outside the foundation, is ten inches from the line. The easterly end of the foundation is one foot eleven inches from the line. These distances are from the south side of the trees. There are no other trees along this line. In making this survey, we determined the line at Sixteenth street, where the curb lines are established and have been set by the city, and the center of this was taken as the center of the street. We began at Sixteenth and measured to Seventeenth street, and measured the distance allowed for half of the street and the parking. We ran through to Seventeenth street, and checked on Seventeenth street in the same manner. I know how the original survey is marked and the monuments placed. There is a series of stones recorded on the plat. They are located at the center of the street on the east and west side of the addition, and I think on the north and south. I do not think they were ever used after they were put in, because, in grading the addition, they were either covered up very deep or cut out entirely. The plat which I made is ten feet, I think, to the inch. The plat is accurate as to the distances of the trees and the house from the north line. I think the lot runs a little over on the rear line and on the street line; that is in measuring the whole block.

It was also admitted by the plaintiff:

That one Finley is a competent engineer, and that he will testify as Mr. Skeels has testified.

There is other testimony offered by the defendant; but we do not set it out, as we do not deem it necessary to do so in settling this controversy.

The burden of proof is on the plaintiff to establish the original boundary line between the two lots. He has offered no competent evidence to show that the true line between the

lots is at the point where he now claims. The testimony of Skeels and Finley shows that the line now claimed by the plaintiff is over and upon lot 2 several inches. We think that the plaintiff recognizes that the line assumed by him is not the original boundary line between those lots. His claim to this strip south of the line seems to rest upon two grounds, either one of which, being established, would entitle him to maintain the line, assumed by him, as the true boundary line:

I. That he was in the actual, open, notorious, exclusive, and continuous possession of this strip of land under color of title or claim of right for the statutory period; that his possession of it during this time has been adverse

1. BOUNDARIES: title by adverse possession.

to the defendant and his grantors. To acquire title to land under this theory, occupancy alone is not sufficient, even for the statutory period. It must be shown that the possession was taken with the intention to assert title beyond the true boundary line. There must not only be possession, but a claim of a right to the possession up to the point of occupancy; or, in other words, the claim of right to possess must be as broad as the possession. Where the intention in taking possession of a piece of land is to occupy only up to the true line, no occupancy beyond that is adverse; or, in other words, where one takes possession of a piece of land, and claims a right to occupy the same up to the true line only, and by mistake of measurement, or otherwise, takes possession beyond the true line and occupies it for the statutory period, he acquires no title by such occupancy.

It must be conceded that, in the platting of this addition and in the laying off of lots and numbering them, the line between the lots was fixed at some definite, distinct, ascertainable point; otherwise, there would be no means of distinguishing one lot from another, or of dividing the lots. There could not be lots 1 and 2, unless they were divisible entities. The plaintiff's deed called for the south forty feet of lot 1. He says in his testimony that it was his intention to occupy only

the land described in his deed. He did not intend to occupy any portion of lot 2 on the south. Therefore, when he made his measurements and surveys, it was his intention to ascertain and determine the south line of lot 1 and occupy the forty feet immediately north of that south line. He did, in fact, occupy several inches to the south of his south line, or several inches upon lot 2, and his occupancy, therefore, was not under claim of right to occupy any portion of the land in lot 2; but he evidently overstepped through a mistake in the measurement. His claim of right, therefore, was not as broad as his possession. It is the absence of the intent in taking possession beyond the true boundary line that fixes the character of the entry, and determines that the occupancy is not adverse. The plaintiff in his testimony says in substance:

When I made my measurements, and when I had the land surveyed, it was my intention to fix the line; that is, the line between lots 1 and 2, as it appeared in my deed. I had no intention of claiming anything, except as shown by the survey at the time the survey was made. I never, to my knowledge, made a claim to a point beyond the land described in my deed; i. e., the line between the lots 1 and 2.

We think the following authorities deny to the plaintiff any right to this strip of land under this claim: *Grube v. Wells*, 34 Iowa, 148; *Mills v. Penny*, 74 Iowa, 172; *Fisher v. Muecke*, 82 Iowa, 547; *Goldsborough v. Pidduck*, 87 Iowa, 599; *Kahl v. Schmidt*, 107 Iowa, 550; *Miller v. Mills County*, 111 Iowa, 658; *Lawrence v. Washburn*, 119 Iowa, 109; *Webster v. Shrine Temple*, 141 Iowa, 325; *Keller v. Harrison*, 151 Iowa, 320. The cases upon this point have been fully reviewed in the last two cases cited above, and the doctrine herein stated adhered to. In *Webster v. Shrine Temple Co.*, it is said:

The plaintiff, testifying as a witness, expressly admits that she never at any time intended to make any claim to the property other than such as belonged to her, and that she claimed up to the alleged boundary because she believed and

supposed it to be the correct line. Under the rule established in this state, possession thus taken and held by mistake, and without intention to assert title beyond the true boundary, is not adverse, and, without more, never ripens into title, citing Miller v. Mills County, supra. Moreover, the conduct of the plaintiff on one hand, and the church authorities on the other, as developed in the testimony, tends strongly to rebut the theory that plaintiff and her grantors made any claim of right or title to the property, except so much thereof as was included within the true boundaries of the tracts described in their deeds.

In *Keller v. Harrison, supra,* it is said:

As such possession was under claim to it [the land in controversy] as part of the northwest quarter of section 28, it was held on the former appeal that if this strip was not a portion thereof, but was a part of the northeast quarter of that section, his possession could not have been adverse. Such has been the doctrine of this court since *Grube v. Wells, supra.*

This doctrine has become so firmly imbedded in the jurisprudence of this state that we do not feel disposed to depart from it, although there are other states holding to a different doctrine.

II. The other ground upon which plaintiff relies is that of acquiescence; that the parties, or their grantors, have acquiesced in the line claimed by the plaintiff for such a length of time that it will be presumed that it is the line between the parties, and the line that should govern the parties as to the extent of their respective properties, because of such acquiescence, and reliance is had upon *Miller v. Mills County, supra,* to sustain this contention. The plaintiff, in stating the doctrine for which he contends, quotes from *Keller v. Harrison,* 139 Iowa, 385, as follows:

2. SAME: acquiescence: evidence.

That if defendant, by himself, employees, or tenants marked by the planting of trees, grove, or other improvements, a visible division line, in good faith believing it to be the true

boundary, and for more than ten years subsequent thereto occupied and made use of the land up to such line,  . . . then they will be conclusively presumed to have agreed thereto as the boundary line, and neither party can be heard to say that the division line so marked is not the true boundary line.

This quotation purports to be taken from page 394 of 139 Iowa, *Keller-Harrison* case, but omits this very important part of the quotation:

And during such period the owners of plaintiffs' land occupied and cultivated their land up to such line, then it will be conclusive.

The portion attempted to be quoted, paraphrased, states that, if the defendant marked, by planting trees, etc., a visible division line, in good faith believing it to be the true boundary line, and occupied his land up to that line, and the other party also occupied and cultivated his land up to such line, thus acquiescing in the line made by the defendant, it will be conclusively presumed that both parties agreed to that as the boundary line, and thereafter neither party can be heard to say that the division line so marked is not the true boundary line.  See the same case reported in 151 Iowa, 320.

It is apparent that one party cannot acquiesce in a line created by himself, and bind the other party by his acquiescence, even though he acts in good faith, believing it to be the boundary line.  Many definitions of acquiescence are to be found in the books.  In *Scott v. Jackson,* 89 Cal. 258 (26 Pac. 898), we find the following definitions:

Acquiescence is where a person who knows that he is entitled to impeach a transaction or enforce a right neglects to do so for such a length of time that under the circumstances of the case the other party may fairly infer that he has waived or abandoned his right.

Acquiescence is a consent inferred from silence; a tacit encouragement.

See case above.

In *Lowndes v. Wicks*, 69 Conn. 15, 30 (36 Atl. 1072-1079), we find the following definitions:

Acquiescence has been well defined as acquiescence under such circumstances that assent may be reasonably inferred from it. . . . Assent thus given is as irrevocable as if expressly stated in words.

Assent is a necessary inference from acquiescence, and estoppel is generally the necessary consequence of assent.

In *Sneed v. Osborn*, 25 Cal. 628, the court said:

The acts of the parties might not amount to an agreement between them to locate the tract as then surveyed, and it is unnecessary to consider them in that view; but do they not show an acquiescence by the parties in those lines . . . between the two tracts of land? If they do show such acquiescence, it will make no difference in the result that they acted in ignorance or under a mistake as to the true northern line. . . . The authorities are abundant to the point that, when the owners of adjoining lands have acquiesced for a considerable time in the location of a division line between their lands, although it may not be the true line according to the calls of their deeds, they are thereafter precluded from saying it is not the true line. The better opinion is that the considerable time mentioned . . . must at least equal the length of time prescribed by the statute of limitations to bar a right of entry.

This decision recognizes the doctrine of acquiescence, and that the line claimed must have been acquiesced in by the parties on the other side of the line. Acquiescence involves more than a mere establishment of a line by one party, and the taking of possession by him. It involves the idea that the other, with knowledge of the line so established and the possession taken, assents thereto, and this may be shown by his conduct, by his words, or even by his silence. There must, however, be something in the record to show that the party, charged with acquiescence, consented to the act of the other in establishing the line and assuming possession. Acquiescence means a con-

sent to the conditions, and involves knowledge of the conditions. . No one can be said to have acquiesced in a line until it is shown first that he had notice or knowledge of the claimed line. Acquiescence involves the idea of notice or knowledge of conditions, and the evidence must disclose that with such notice and knowledge he did something that indicated an assent to such conditions and an acquiescence therein. As said in *Miller v. Mills County, supra:*

The great current of authority sustains our conclusion that, in the absence of other controlling circumstances, the inference is conclusive that the dividing line between adjoining tracts, definitely marked by the erection and maintenance of a fence or other monuments, recognized by the owners of such, and up to which they have occupied and cultivated the land on either side for more than ten years, the statutory period of limitations, is the true boundary between them.

This rule obtains, even though the line thus fixed and recognized and acquiesced in was not, in fact, the true original line, and even though it appeared that the parties, during the time, were in ignorance of or mistaken as to the true line between them. Proof of acquiescence is not proof in all cases of the original boundary line, but the line thus fixed by acquiescence becomes the true boundary line between the parties, without regard to the original; but the line so fixed by the acquiescence of the parties, in the absence of any other proof, is presumed to have been the proper original dividing line. As stated in *Klinkner v. Schmidt,* 114 Iowa, 699:

We apprehend the distinction between the doctrine of the cases which deny efficacy to an occupancy founded on mistake and those which recognize occupancy to a line established by acquiescence to be this: That in the one case the assertion of title is presumed to be limited to the premises covered by the grant under which possession is claimed, while in the other case there is a wholly independent basis for the assertion of title, to wit, acquiescence of the adjoining owner. . . . This acquiescence is not to be presumed from the mere fact of notorious possession by the adverse claimant to a line which

he himself has established. It must be shown by proof of an express agreement, or of facts from which an agreement may be implied. When shown, it may be considered as an admission of title, or as an agreement in settlement of the controversy between the parties, or as a basis of an estoppel, or, as in this case, the foundation of a claim of right, which, followed by possession for ten years, will ripen into title.

See, also, *Palmer v. Osborne,* 115 Iowa, 713; *Biglow v. Ritter,* 131 Iowa, 213.

Upon an examination of the record in this case, we find that there is no basis for the contention that the defendant Cora Nisbit Brown, or her grantor, Marcus E. Brown, or his grantor, E. F. Leland, ever knew of plaintiff's contention until the purchase by Brown from Leland, which was in 1905. Prior to that time, the land appears to have been unoccupied by any one. There is nothing to show that Leland ever knew of plaintiff's claim, or did anything to indicate that he acquiesced in the same. It does not appear that he resided in Sioux City, or had ever seen the land in controversy. There is no basis for claiming, then, that the Browns or their immediate grantors ever acquiesced in anything that the defendant did in the way of establishing a line. The chain of title from the government does not appear in this record.

It is contended, however, by the plaintiff, that one C. G. McNeil was the owner at the time plaintiff made his measurements and established his line; that McNeil acquiesced in it, consented to it, and approved of it.; but there is no competent proof of McNeil's interest or ownership in this land. The plaintiff's statement that McNeil was the owner of it apparently is based upon what Flanagan said to him. There is no competent evidence that Flanagan had any interest in this land. Plaintiff testified that the property stood in Flanagan's name. Plaintiff went to Flanagan to ascertain who was the owner of this land. Flanagan told the plaintiff it was McNeil. Flanagan, called as a witness, testified that McNeil owned it. He was asked whether he knew that McNeil owned it, and he

said, "No." He said he did not know whether McNeil owned it or not. He was under the supposition that McNeil owned it. Flanagan, interrogated as to his ownership, said:

I don't know how it happened that the record title was in me. When Griffin asked me for the owner of the property, I sent him to McNeil. I supposed McNeil was the owner.

Evidently he supposed that the property was in his name by McNeil's request. Something more than the mere supposition of a witness that a certain man is the owner of a certain tract of land is necessary in order to establish ownership in the supposed owner. It does not appear that McNeil was at any time in the line of title. He was not defendant's grantor. It appears that Flanagan was not the defendant's grantor. It does not appear that Flanagan knew anything about plaintiff's claimed line, or that he assented to it. There being no competent evidence that McNeil was the owner of the land at the time plaintiff claims that he acquiesced in the establishment of the line at the point claimed, his acquiescence cannot be considered as binding upon these defendants, if any such acquiescence there was. There is no evidence that Flanagan acquiesced in it. Indeed, he testifies that he had no interest in the lot; that he did not know how the property came to be in his name. See *Palmer v. Osborne,* 115 Iowa, 714.

It appears that the lot was vacant and unoccupied, and it does not appear that any one, shown to have title to the land in question, during any of the time intervening between the establishment of this line and the beginning of this suit, ever had any knowledge of plaintiff's line, or his claim, or of his possession, or acquiesced therein, or did any act indicating acquiescence, that would bind these defendants. We think the plaintiff has failed to establish his claim under any of the theories advanced, and that the cause below was rightly determined adverse to him; and it is therefore—*Affirmed.*

LADD, C. J., and DEEMER and WITHROW, JJ., concur.