MARY JAHNKE et al., Appellants, v. M. M. SEYDEL et al., Appellees.

**REFORMATION OF INSTRUMENTS: Grounds—Reformation Carrying Lands of Stranger.** On no grounds may a deed be so reformed as to embrace the good-faith record holdings of a stranger to the controversy.

**ADVERSE POSSESSION: Character of Possession—Mistakenly Holding Beyond True Line.** Adverse possession may not bo predicated on a possession which is supposedly to the true line only, but which, in fact, is in excess thereof.

**ESTOPPEL: Equitable Estoppel—Evidence—Sufficiency.** Evidence reviewed, and held wholly insufficient on which to base an estoppel to claim title to real estate in controversy.

*Appeal from Johnson District Court.*—R. P. HOWELL, Judge.

FRIDAY, NOVEMBER 17, 1916.

ACTION to quiet title. Opinion states the facts. Decree below dismissing plaintiffs' petition.—*Affirmed.*

*Remley & Abrams,* and *Henry Negus,* for appellants.

*O. A. Byington,* for appellees.

GAYNOR, J.—I. This is an action to recover possession and quiet title to a certain 15-foot strip along the east side of Lot 4 in Block 41 in Iowa City, Iowa. Plaintiffs claim

1. REFORMATION OF INSTRUMENTS: grounds: reformation carrying lands of stranger.

that there was a mistake in the deed under which they received title, and also a mistake in the deed under which their immediate grantor received title, in this, that the deed should have included this strip of land. The prayer of the petition is that the deeds be reformed so as to include this strip within plaintiffs' deed, and then to quiet title in them. Plaintiffs also claim title by adverse possession for the statutory period, and on this ground also ask that the title be quieted. The answer of the defendant is practically a general denial. Upon a full trial of the case, a decree was entered for the defendants, dismissing plaintiffs' petition, and from this, plaintiffs appeal.

The land in dispute is part of Lot 4, Block 41, Iowa City, Iowa. Lot 4 lies immediately west of and adjoins Lot 3. These lots, as platted, were 80 feet wide, east and west, and 150 feet long, north and south. Plaintiffs' land is in Lot 4. Defendants' land is in Lot 3. The strip in dispute is 15 feet off the east side of Lot 4. In 1890, and prior thereto, F. D. Lindsley was the owner of the land now conceded to be the property of both the plaintiffs and the defendants, including this strip in controversy. On September 16, 1901, he conveyed, by warranty deed, the west 65 feet of Lot 4 to one S. Patterson, and on the same day conveyed by warranty deed the east 15 feet of Lot 4 and the west 65 feet of Lot 3 to one W. R. Patterson, the son of S. Patterson. Both these deeds were duly recorded. On November 25, 1907, S. Patterson conveyed by warranty deed the west 65 feet of Lot 4 to one Frederick Jahnke, plaintiffs' immediate grantor. On the 7th day of May, 1909, the said W. R. Patterson, by warranty deed, conveyed the east 15 feet of Lot 4 and the west 65 feet of Lot 3 to the defendant M. M. Seydel. Seydel, on the 24th day of June, 1911, conveyed an undivided one-half interest in the

land so purchased from W. R. Patterson, to his co-defendant, Blanche Seydel.

In 1890, while Lindsley was the owner of the property, he built the house now upon the property occupied by the plaintiffs. He built also a chicken house, on or near the northeast corner of Lot 4. It appears that there was no building on the land in Lot 3 at that time. Lindsley also planted trees, while he was the owner of Lot 4 and the west 65 feet of Lot 3. This chicken house stands upon the land in controversy. The trees are on the land in controversy, and, it is claimed by the plaintiffs, mark a line between the lots. There is nothing in the record to show that, in the planting of these trees, the owner of the premises had any purpose to indicate a line between the lots. At that time, he owned the property on both sides of what is now claimed to be the line. He owned all of Lot 4 and the west 65 feet of Lot 3.

After the sale by Lindsley to the Pattersons, the record does not disclose any controversy between the father and son, touching the line between the several properties conveyed to them by Lindsley, nor is there disclosed in this record any proof of any mistake in the deeds from Lindsley to the Pattersons. So far as this record appears, the deeds to each of the Pattersons described accurately and correctly just what each purchased and paid for. Neither of the Pattersons was called as a witness in this case. We must assume, therefore, that, as to the Pattersons, there was never any controversy touching the territorial extent of the property described in their several deeds. The presumption is that, when one enters upon land, he claims a right under the instrument of conveyance upon which his right to enter rests, nothing further appearing. We must further presume, not only that his entry was under his deed, but that his claim to right of occupancy, territorially, does not go beyond the limits of the right conferred by the deed.

The deed to S. Patterson was only of the west 65 feet of Lot 4. An agreement or an understanding by or with him,

to convey more of this Lot 4 than was conveyed to him by his deed, was an agreement or an understanding to convey more than he had any right to convey. Even if we concede that he pointed out to the plaintiff a line so far east as to include the 15 feet in dispute, he must have pointed out and agreed to convey land to which he had no title; for the record shows that this 15 feet was conveyed by Lindsley to the other Patterson. If a proper basis had been laid by proof, this might be the basis of an action for damages. It would be no ground for reforming the deed to these plaintiffs so as to include lands that he did not own—lands in fact owned by his son, W. R. This would be true whether he pointed out the line by mistake or wrongfully.

A decree that would invest plaintiffs with any right under their purchase from S. Patterson would necessarily result in divesting W. R. of his title, acquired under his deed from Lindsley. There was conveyed to W. R. this east 15 feet of Lot 4, or the very land in controversy. The record showed title to this strip to be in him at the time plaintiff purchased. The deed was of record, and plaintiffs are charged with notice of its contents. If we should reform plaintiffs' deed from S. Patterson to their father, we would, by so doing, invest them with the title, and, by the same act, divest W. R. of the rights acquired in this strip under his deed from Lindsley. There is no ground in this record for reforming any of the deeds, and the court rightly so held.

II.   On the question of adverse possession, we have to say that there is no evidence of adverse claim or possession by either of the Pattersons against the other at any time. At no

2. ADVERSE POSSES-
SION: character
of possession:
mistakenly
holding beyond
true line.

time during the ownership of the Pattersons is there anything to indicate that one made any claim against the other beyond the limits of the territory described in his deed. Mere occupancy does not, in and of itself, start the statute of limitations. Occupancy beyond the limit of the territorial right conveyed, without claim of right or color of title, does not

start the statute of limitations. One who, by mistake as to the true line, occupies beyond the true line, claiming only a. right to the true line, does not make the occupancy adverse, or start the statute of limitations against his neighbor. The claim of right to occupy must affirmatively appear, and cannot be inferred from occupancy alone. Even though we concede that plaintiffs' grantor, S. Patterson, did in fact occupy a portion of this strip in controversy, there is nothing to indicate that such occupancy was taken or held adverse to the title of his son, under his deed from the same grantor. To make possession adverse under claim of right, there must be a claim as broad as the possession.

So far as this record shows, whatever use S. Patterson and his tenants made of this strip of land and of the henhouse situated upon it was merely permissive. If S. Patterson claimed more than was included in his deed, there was nothing in the possession assumed, or the control exercised over this 15-foot strip by him, that charged W. R., or anyone else, with notice that he claimed it under his deed from Lindsley. That this was true is emphasized by the relationship of the parties at the time. There is nothing in this record to show that S. Patterson did not know exactly the description of the property purchased by him from Lindsley, as the same was recorded in his deed. There is nothing to show that S. Patterson believed or thought that he had purchased more than the west 65 feet of Lot 3. It may be assumed that he thought the line extended farther east; it may be assumed that he thought it extended as far as plaintiffs now claim the line to be; but the fact still remains that there is no evidence that he claimed any land beyond the boundary of the description in his deed. His possession, therefore, beyond the limit of the land purchased, of necessity cannot be said to be under claim of right. This would not make it adverse, under the rule laid down in *Grube v. Wells,* 34 Iowa 148, and followed by *Mills v. Penny,* 74 Iowa 172; *Fisher v. Muecke,* 82 Iowa 547; *Goldsborough v. Pidduck,* 87 Iowa 599; *Kahl v. Schmidt,*

107 Iowa 550, and *Griffin v. Brown,* 167 Iowa 599. From these authorities, it is apparent that, before title can ripen by adverse possession, the possession must be actual, open, notorious, exclusive, continuous, under color of title or claim of right, for the statutory period. Occupation alone is not sufficient, even for the statutory period. It must be shown that the possession was taken with the intention to assert title beyond the true boundary line. The presumption, in the absence of any evidence to the contrary, is that, where one takes possession under a deed, his intention in taking possession and in occupying it is to hold and claim only that which is within the territorial limits of his grant. There must appear to be a claim of right to occupy beyond the true boundary line, before the occupancy can be said to be adverse. A mistake as to the line, followed by occupancy beyond the line, does not make the occupancy adverse. We find no evidence upon which to predicate a finding that S. Patterson claimed or occupied this strip of land under claim of right or color of title. There is some testimony in the record given by the wife of S. Patterson, mother of W. R. Patterson, in substance as follows:

"My son had no garden or any chickens at the time we were using the chicken house and the garden. I never had any conversation with my son as to the division line between the lawns. Both lawns were mowed by one person at the same time. I never heard any conversation between my husband and son as to where the line was between the two lots. There was never any question raised about the lines during the time we lived there. My husband and I used the chicken house and the garden north of the chicken house. Our son never objected to our use of the chicken house."

She then says:

"On the portion of the land purchased by my husband, there was a dwelling house, a barn, woodshed and chicken house."

And then she gives her opinion or conclusion that the

chicken house was on the portion purchased by her husband. There is nothing in the record to indicate that she knew in fact what portion of the land in controversy was conveyed to either her husband or her son. Her husband was dead; the son was not called as a witness. Inasmuch as there is nothing in the record which indicates the starting of the statute of limitations prior to the purchase by the parties to this suit, we are not further concerned with the question of adverse possession under the statute of limitations; for, even though it may be conceded that the Jahnkes claimed title to this 15-foot strip, and occupied it adversely, yet their occupancy has not been for the statutory period. Their deed was not executed, nor possession taken under the deed, until November, 1907, and this suit was commenced on the 27th day of January, 1914.

III. It is claimed, however, that W. R. Patterson acted for his father in selling to these plaintiffs the land in Lot 4. It is claimed that he represented to these plaintiffs that

3. ESTOPPEL: equitable estoppel: evidence: sufficiency.

his father was the owner of this 15-foot strip in question, and that, when they purchased, it was the understanding that the land conveyed included this 15-foot strip. This claim is based on the testimony of the Jahnkes. It appears that, in 1905, two years prior to the purchase of the land, the senior Jahnke had rented from S. Patterson the land owned by him in Lot 4; that, when he rented to them, he gave them the right to use the henhouse, and said, ''The henhouse stands on my land and is mine. You put your chickens in that henhouse;'' that thereafter, while Jahnkes were tenants of S. Patterson, they used the henhouse, and a portion of this 15-foot strip for garden purposes; that thereafter, W. R. Patterson came to the plaintiff, as a representative of S. Patterson, and asked Mr. Jahnke if he desired to purchase the place; that W. R. was then asked this question, if he wanted to sell the place that his father had rented, or ''that we occupied,'' and he said, ''Yes;''

that the price was then agreed upon and the deal consummated, and the deed executed as hereinbefore set out. It is claimed that, by this, W. R. Patterson is now estopped to claim that the elder Jahnke did not acquire this 15-foot strip at the time of his purchase; that Jahnke went into possession of this 15-foot strip after the time of his purchase, and continued to occupy it and was in possession of it at the time the defendants purchased; and that they were, therefore, charged with notice of his right.

The plaintiffs purchased from Patterson, as evidenced by their deed, only the west 65 feet of Lot 4. The house was on the land described in their deed. It is not claimed that W. R. Patterson, at the time he said this, knew that anything had been said by his father to this Jahnke touching the location of the henhouse, or concerning his right to this 15-foot strip. He was asked by Jahnke, when he approached Jahnke to sell his father's land, "Is it the same land we rented?" and he said, "Yes." There was nothing to indicate any fraudulent purpose on his part, or that he knew that the father had rented to them more than his deed called for. The Jahnkes did not tell him at the time that they had occupied more of the premises than the father owned. We think this evidence is altogether too meager, and is, therefore, wholly insufficient on which to base an estoppel.

The record presents no ground for reversal, and the cause is—*Affirmed.*

EVANS, C. J., LADD and SALINGER, JJ., concur.