Frances N. BOYLE, Plaintiff,

v.

**D-X SUNRAY OIL COMPANY,**
Defendant.

Civ. No. 778.

United States District Court
N. D. Iowa, E. D.

Feb. 15, 1961.

Charles J. Pickett, of Birdsall, Pickett & McLendon), Waterloo, Iowa, for plaintiff.

J. Paul Greve, Tulsa, Okl., and Arthur A. Zimmerman, of Zimmerman & Zimmerman, Waterloo, Iowa, for defendant.

GRAVEN, District Judge.

The present action involves a dispute between the plaintiff and the defendant as to the proper location of a boundary line between two lots located in the City of Waterloo, Black Hawk County, Iowa. The action was originally commenced in the District Court of Iowa in and for Black Hawk County and was subsequently removed to this Court pursuant to the provisions of Section 1441 of Title 28, U.S.C.A. Jurisdiction in this Court is predicated upon diversity of citizenship. The plaintiff is a citizen of Iowa and resides in the City of Waterloo, Iowa. The defendant is a corporation organized and existing under the laws of the State of Delaware. At the time of the removal of the present action to this Court, the amount required to be in controversy for purposes of diversity of citizenship jurisdiction was more than $3,000, exclusive of interest and costs.

The plaintiff and the defendant own adjoining lots in the City of Waterloo. The defendant has caused a survey to be made by a licensed civil engineer and land surveyor in order to establish the true boundary between the two lots. The plaintiff objects to the location of the line which that survey showed as being the south boundary of plaintiff's lot and the north boundary of defendant's lot. It is the claim of the plaintiff that no matter where the true or surveyed boundary may be located, a particular line, clearly marked by a division fence, has been recognized as the boundary line between the lots in question and acquiesced in as such by the defendant's predecessors in title and by plaintiff and her predecessors in title for a period of more than ten years. Plaintiff urges that such a course of conduct is sufficient, under Iowa law, to establish the line which has been acquiesced in as the legally recognized boundary between the two lots. The line which was established by defendant's survey as the boundary between the two lots is approximately thirty-five feet north of the line which plaintiff claims has long been acquiesced in by the owners of the respective properties as the boundary between the lots. Plaintiff also claims that there has been open, notorious, continuous adverse possession of the disputed strip by her and her predecessors in title for several decades.

The defendant has apparently filled in with earth along the north edge of its lot and placed part of the fill north of the line to which the plaintiff is claiming as owner. Apparently the filling in by the defendant has caused some erosion on the plaintiff's lot. In her prayer for relief, the plaintiff asks that the Court establish that her south boundary lies along the line which she claims has been long acquiesced in as such and that the defendant be enjoined from placing earth north of this line and be required to remove any earth which it has heretofore placed north of that line. The defendant denies the claim of the plaintiff to the area in question and by cross-complaint asks that title to that area be quieted in it.

The plaintiff has lived on the lot which she presently owns since 1935. She acquired title to the lot in 1948 by a deed from her mother-in-law. Plaintiff's husband, John Boyle, has lived on that property continuously since 1919, except for two years during World War II. Plaintiff's lot has a dwelling house thereon, which was built in the fall of 1890. In addition, there have existed on plaintiff's lot a garage, barn, corn crib, shed, milk house, and at one time a brooder house for chickens. It is not clear how many of these outbuildings were still standing at the time this action was commenced but plaintiff and her husband were still

residing in the dwelling house on her lot as recently as November, 1960.

The defendant acquired title to the lot which adjoins the plaintiff's lot on the south in 1954. Defendant has since constructed a gasoline service station thereon. Prior to the defendant's acquisition of this property, the lot had apparently never contained any building or other improvements of any description. The only use to which the property had been put before the defendant purchased it was as a garden plot.

Plaintiff's lot and defendant's lot both front on LaPorte Road. That street forms the west boundary of both lots. The two lots join so as to form a triangular-shaped tract of land lying in the "Y" formed by the intersection of LaPorte Road and the right-of-way of the Chicago, Rock Island & Pacific Railroad Company. This intersection forms the northerly corner of the plaintiff's triangular-shaped lot. At one time both lots were owned by one Henrietta Hitts. Mrs. Hitts sold plaintiff's lot in 1890 and defendant's lot in 1891 and since that time each lot has been owned by several different individuals. Plaintiff's deed describes her lot merely as the north one acre of the land (as described by section, township, and range) lying in this "Y." There is no metes and bounds description contained therein nor are any dimensions given as to the three sides of her lot. In the deed which Mrs. Hitts gave to one Sarah Garvey, a predecessor in title of the defendant, the tract currently owned by the defendant was described as commencing at the south line of the north one acre (plaintiff's lot) already sold off by Mrs. Hitts. That deed also listed the front footage of this south lot which bordered on LaPorte Road as approximately 197 feet and described the quantity of land conveyed as being one acre.

The results of the survey made by the licensed engineer and surveyor show the frontage of defendant's lot on LaPorte Road to be approximately 276 feet, or about 79 feet more than was called for in the original conveyance of that lot from Mrs. Hitts. That survey also shows that defendant's lot contains 1.514 acres instead of one acre. Such dimensions and quantities were obtained by first setting off plaintiff's lot as precisely the north one acre lying in the "Y" previously described. It appears that although the original grantor of the two lots thought she was splitting a two-acre parcel into two one-acre parcels and selling them separately, there was in fact approximately two and one-half acres in the original parcel. Such a miscalculation as to quantity is not surprising in view of the irregular shape of the parcel in question.

John Boyle, the plaintiff's husband, moved into the house on the lot now owned by the plaintiff in 1919. He was at that time twelve years of age and lived there with his mother, Effie Clements, and his stepfather, George Clements. George and Effie Clements owned that lot jointly from 1920 to 1925, and Effie Clements owned the lot from 1925 until she transferred it to the plaintiff in 1948. John Boyle testified that there was a fence marking the south boundary of the Clements property when they moved onto it in 1919. It consisted of wooden posts and four strands of barbed wire and was approximately five feet in height. It began at the crotch of a double walnut tree in the southwest corner of the lot and ran from there east to the railway right-of-way. He stated that the fence existed in that fashion until 1930 at which time it was taken down and a new fence was put up in the same place. The new fence consisted of poultry wire with barbed wire strands along the top. The barbed wire from the old fence was used for this purpose, the wooden posts were replaced with steel posts. This fence built in 1930 was never removed by the Clements or the Boyles. Mr. Boyle testified that the fence in question was pretty well shot the last four to six years prior to defendant's acquisition of the lot to the south of them in 1954. In the late forties he had tried to contain some ponies along the south line of the plaintiff's lot

and the fence would not keep them in. By 1953 most of the posts were falling over and Mr. Boyle removed most of them. The barbed wire and poultry wire were left lying on the ground along the fence line and eventually became tramped and matted down by livestock. Mr. Boyle said the wire was still there at the time of the trial in November, 1960, although it was covered up by defendant's earth fill. The steel post which marked the eastern end of the fence and the southeast corner of plaintiff's lot was still visible in November, 1960, according to Mr. Boyle, but the double walnut tree which had marked the west end of the fence had been removed by the defendant.

The plaintiff testified that the poultry wire fence was standing when she moved onto the lot in question in 1935. It ran from the double walnut tree in the southwest corner to the railroad property. She said the fence was quite dilapidated from about 1945 on but it was standing until 1953 or 1954 when the posts were removed. A Mr. and Mrs. Wood both testified. They had lived with the Clements in 1932 and remembered that there was a fence along the south line of the property at this time. Neither one of them referred to the walnut tree. A Mr. Halley, who had lived in the neighborhood during the time of World War I before the Clements moved there, said he remembered that there was a wooden post and barbed wire fence from the highway (LaPorte Road) to the railroad right-of-way. Mr. Halley said that he had passed the property often through the years and thought that some sort of a fence had been maintained in the same place from that time up until about five years ago.

Mr. Boyle testified that extensive gardening had been carried on on the plaintiff's lot from the time the Clements and he moved there in 1919 up until 1954. During part of this time they operated a commercial vegetable stand on the premises. They always gardened up to the fence on the south although they would rotate the garden plot back and forth between the east and the west half of the lot. Cattle, donkeys, ponies, and hogs were kept close to the south fence at various time on the half of the lot not in garden. In 1930, after the poultry wire fence was constructed, poultry were kept for three or four years along the south fence on the east half of the lot. During this time a sixteen foot by twenty foot brooder house four feet in height was kept within three feet of the south fence. Plaintiff testified that since she moved there in 1935 they had gardened up to the fence every year with the exception of 1943–1945. She said they plowed as close to the south fence as they could get a team.

The plaintiff and Mr. Boyle both testified that some people named Hursh had the lot to the south of them during all the time they had been there. Plaintiff testified that for three or four years beginning about 1945 the Hurshes gardened on the lot to the south of the Clements lot. During some of these years the garden was large and came all the way to the fence. Apart from this three or four year period, however, the Hurshes did not personally garden their lot. Mr. Boyle testified that there were some years when he gardened on the Hurshes' lot south of the fence but he always made an arrangement with them for so doing. Both the plaintiff and Mr. Boyle testified that the Hurshes sometimes came to gather walnuts from the double walnut tree on the fenceline. On these occasions the Hurshes gathered only those walnuts which fell on their side of the fence. Mr. Boyle testified that the Hurshes told the Boyles and Clements that all nuts which fell on the north side of the fence belonged to Boyles and Clements. The time of the Hurshes' walnutting expeditions was not definitely fixed by this testimony, although it was apparent that they came more than once.

■■ It seems desirable to first dispose of the plaintiff's claim that she has acquired title to the disputed strip by means of the adverse possession thereof. Broadly stated, the Iowa law of adverse possession is such that in order to estab-

lish ownership in this manner, one is required to prove that he has been in hostile, actual, open, exclusive, and continuous possession, under claim of right or color of title for at least ten years. Petrus v. Chicago, R. I. & P. R. Co., 1933, 245 Iowa 222, 61 N.W.2d 439, 442; Meyers v. Canutt, 1951, 242 Iowa 692, 46 N.W.2d 72, 75, 24 A.L.R.2d 1; Nichols v. Kirchner, 1949, 241 Iowa 99, 40 N.W.2d 13, 16. There has been considerable litigation in Iowa concerning the application of this doctrine in situations involving boundary line disputes where one party has occupied beyond the true line solely because of ignorance as to its correct location. Ever since the holding in the early Iowa case of Grube v. Wells, 1871, 34 Iowa 148, it has been the rule in this state that there can not be adverse possession of a disputed strip up to a particular line unless there is an intention to claim title to that line even though it might not be the true line.

In Grube v. Wells, supra, plaintiff's lot adjoined the defendant's lot on the north. When defendant had purchased her lot it was enclosed by a fence. This fence had been erected by defendant's grantor and she felt that it marked the true boundaries to her lot. Actually, the fence along the north was placed fifteen feet over onto the plaintiff's lot. Defendant and her grantor had always occupied all the way to the fence on the north and their combined possessions totaled twenty-five years. When the plaintiff brought an action to recover the possession of the fifteen-foot strip, the defendant claimed that she had acquired title to that strip by adverse possession. The trial court gave judgment for the plaintiff and on appeal this was affirmed. The Iowa Supreme Court stated (at page 150):

"The *quo animo* in which the possession was taken and held is a test of its adverse character. The inquiry, therefore, as to the intention of the possessor, is essential in order to determine the nature of his possession, and, before his possession may be pronounced adverse, it must

be found that he intended to hold in hostility to the true owner."

Because there was no evidence that the defendant in that case had intended to claim beyond the true line in case she was mistaken as to the location of the line, the court held that the requisite "claim of right" was lacking. The doctrine of Grube v. Wells has been followed and approved in the cases of Patrick v. Cheney, 1939, 226 Iowa 853, 285 N.W. 184, 186; Brewer v. Claypool, 1937, 223 Iowa 1235, 275 N.W. 34, 35; Poleske v. Jones, 1921, 192 Iowa 1015, 185 N.W. 917, 919; Evert v. Turner, 1918, 184 Iowa 1253, 169 N.W. 625, 626–627; and Griffin v. Brown, 1914, 167 Iowa 599, 149 N.W. 833, 836. In Patrick v. Cheney, supra, the Court after examining the prior Iowa cases concluded that there can be no adverse possession unless an intent is shown to assert title beyond the true boundary line if necessary. Possession beyond the true line because of mistake of measurement, etc., is not adverse without such an intent. In the trial of that case the following testimony had been given:

"Q. And at the time you got this land * * * you did not intend to claim beyond your true boundary line and beyond the boundary line Mr. Cheney [the owner of the adjoining lot] was claiming? A. I did not intend to claim his property, no sir." [226 Iowa 853, 285 N.W. 186].

The above answer was held to be fatal to the plaintiff's claim of adverse possession beyond the true line. The doctrine operates as to land placed under cultivation by mistake as well as to idle land. See Swim v. Langland, 1943, 234 Iowa 46, 11 N.W.2d 713.

■ The principle just discussed operates so as to render impossible any acquisition of title by adverse possession in the majority of boundary line disputes because, in such cases, encroachment is ordinarily the result of mistake as to the location of the true line. This doctrine has been criticized as placing a premium

on bad faith and as encouraging the possessor to falsely assert a hypothetical intention (to hold beyond the true line *if* that should be necessary) when only in rare cases would such a hypothetical intention be formed. See Bordwell, Mistake and Adverse Possession, 7 Iowa Law Bulletin 129, 137 (1922). It has also been said that the Iowa Court in applying such a rule is placing a different meaning on the phrase "claim of right" in boundary disputes than in cases between diverse claimants to a whole tract of land the boundaries of which are not in dispute. Bordwell, supra, at 133; Comment, 24 Iowa Law Review 601 (1939). Nonetheless, this doctrine remains as the established law of Iowa which this Court is bound to follow. There has been no evidence in this case which would attribute to the plaintiff the requisite hostile intent to claim beyond the true line. Rather, this would seem to be the typical case of a mistaken belief as to the location of a boundary with occupation beyond the true line entirely attributable to the mistake. The Iowa Court has often stated that the law presumes that possession of realty is under regular title or permissive rather than by adverse possession. Petrus v. Chicago, R. I. & P. R. Co., 1953, 245 Iowa 222, 61 N.W.2d 439, 442; Meyers v. Canutt, 1951, 242 Iowa 692, 46 N.W.2d 72, 75, 24 A.L.R.2d 1; Nichols v. Kirchner, 1949, 241 Iowa 99, 40 N.W.2d 13, 16. That Court has also stated that there are usually no equities in favor of one who claims the property of another by adverse possession and that every presumption is against the claimant. Meyers v. Canutt, supra, at page 75 of 46 N.W.2d; Nichols v. Kirchner, supra, at page 16 of 40 N.W.2d. It is the holding of the Court that the plaintiff has failed to establish title to the disputed strip by adverse possession.

▇ The other ground upon which the plaintiff relies is that of acquiescence. It is well settled in this state that where two adjoining owners or their grantors' have, for ten years or more, mutually acquiesced in a line, definitely marked by a fence or in some other manner as the dividing line between them, such line becomes the boundary although a survey may in fact show the true boundary to be elsewhere. This rule is broadly stated in the cases of Trimpl v. Meyer, 1955, 246 Iowa 1245, 71 N.W.2d 437, 439; Vander Zyl v. Muilenberg, 1947, 239 Iowa 73, 29 N.W.2d 412, 415; Leeka v. Chambers, 1942, 232 Iowa 1043, 6 N.W.2d 837, 839; Sieck v. Anderson, 1942, 231 Iowa 490, 1 N.W.2d 647, 650. Many other Iowa cases involving the application of this doctrine as well as many cases from other jurisdictions may be found in the annotations appearing in 170 A.L.R. 1144 (1947); 113 A.L.R. 421 (1938); and 69 A.L.R. 1430 (1930).

▇ The Iowa Supreme Court has repeatedly stated that the doctrine exists separately from that of adverse possession and does not involve the same elements save the ten-year period. See Nichols v. Kirchner, 1949, 241 Iowa 99, 40 N.W.2d 13, 16; Patrick v. Cheney, 1939, 226 Iowa 853, 285 N.W. 184, 186; Helmick v. Davenport, R. I. & N. W. Ry. Co., 1916, 174 Iowa 558, 156 N.W. 736, 740. Unlike adverse possession, one may acquire land beyond the actual survey boundary by acquiescence although neither party intended to claim more than called for by his deed. Trimpl v. Meyer, supra, at page 439 of 71 N.W.2d; Vander Zyl v. Muilenberg, supra, at page 415 of 29 N.W.2d; Concannon v. Blackman, 1942, 232 Iowa 722, 6 N.W.2d 116, 117 and cases therein cited. A detailed discussion of the differences between the two doctrines is found in Patrick v. Cheney, supra, at page 186 of 285 N.W.

The first case to apply the doctrine of acquiescence in Iowa was Miller v. Mills County, 1900, 111 Iowa 654, 82 N.W. 1038. In that case, a division line between two forty-acre tracts had been jointly maintained by the plaintiff and the defendant county. Both parties and their grantors had cultivated the land on their side of the division line up to that line for at least eighteen years. Subsequent to this period of acquiescence, the defendant county discovered from a sur-

vey that the division which was being maintained was about sixteen to twenty feet over on its property. It then moved at least part of the fence over to the line indicated by the survey. The plaintiff then sued to recover possession of the intervening strip. The Supreme Court, in an opinion by Justice Ladd, recognized that the doctrine of Grube v. Wells prevented the plaintiff from acquiring the disputed strip by adverse possession. The Court held, however, that (at page 1040 of 82 N.W.):

"* * * the great current of authority sustains our conclusion that, in the absence of other controlling circumstances, the inference is conclusive that the division line between adjoining tracts, definitely marked by the erection and maintenance of a fence or other monuments, recognized by the owners as such, and up to which they have occupied and cultivated the land on either side more than 10 years,—the statutory period of limitations,—is the true boundary between them."

In speaking of the cases exemplified by Grube v. Wells, the Court stated (at page 1041 of 82 N.W.):

"* * * In [such] cases the issue of adverse possession, and not the location of the boundary by acquiescence, was the subject of investigation. The effect of acquiescence in a division line as evidence of the true boundary has not heretofore been touched upon, [in this state] * * * Such a rule tends to prevent uncertainty in division lines, and to avoid litigation resulting from the disturbance of boundaries long established. As the hedge and board fence was shown to mark the true boundary *between the parties,* regardless of the location of the government lines, the petition ought not to have been dismissed." (Emphasis supplied.)

Thus, the reason for the rule, as announced, is the quieting of interests long enjoyed. This rationale has been repeated by the Iowa Court in the cases of Quinn v. Baage, 1908, 138 Iowa 426, 114 N.W. 205, 208; and O'Callaghan v. Whisenand, 1903, 119 Iowa 566, 93 N.W. 579.

The doctrine has been recognized by statute. Section 650.6, Code of Iowa 1958, I.C.A., originally enacted in similar form by the Fifteenth General Assembly in 1874, provides:

"Either the plaintiff or defendant may, by proper plea, put in issue the fact that certain alleged boundaries or corners are the true ones, or that such have been recognized and acquiesced in by the parties or their grantors for a period of ten consecutive years, which issue may be tried before commission is appointed, in the discretion of the court."

For a discussion of the history of this Section, see Kennedy v. Oleson, Iowa 1960, 100 N.W.2d 894, 899. This Section appears in the Code as a part of Chapter 650 which provides for the determination of lost corners by a special action wherein the Court may appoint a commission for this purpose. The effect of Section 650.6 is to allow either party in such special proceeding to have any issues of acquiescence in a particular boundary determined by the Court before a commission proceeds to find the true survey boundary. See Lannigan v. Andre, 1950, 241 Iowa 1027, 44 N.W.2d 354, 356; O'Dell v. Hanson, 1950, 241 Iowa 657, 42 N.W.2d 86, 88. The Iowa Court has indicated that the statute is only declarative of the principles involved in any case involving acquiescence whether it is a regular action or under the special chapter. Kennedy v. Oleson, supra, Trimpl v. Meyer, supra. Apparently the requirements for establishing acquiescence are the same in regular actions and special actions under Chapter 650. The present action is not brought under Chapter 650. For a discussion of such special actions, see Keith, Government Land Surveys and Related Problems, 38 Iowa Law Review 86, 110–15 (1952). Cases wherein the Iowa Court has determined questions of acquiescence in actions brought under Chapter 650 in-

clude Lannigan v. Andre, supra; Concannon v. Blackman, supra; Eggers v. Mitchem, 1948, 239 Iowa 1211, 34 N.W.2d 603.

■ In the instant case, the burden is on the plaintiff to show that the line claimed by her has been mutually acquiesced in for the requisite period. Trimpl v. Meyer, supra; Lannigan v. Andre, supra; Webster v. Shrine Temple Company, 1908, 141 Iowa 325, 117 N.W. 665. The Iowa Court has said that insofar as the line claimed varies from the true survey line, such proof should be clear. Trimpl v. Meyer, supra; De Viney v. Hughes, 1952, 243 Iowa 1388, 55 N.W.2d 478, 480.

■ In order to establish a boundary line by acquiescence, the acquiescence must be by both of the adjoining landowners. It involves notice of the claim of the other party. De Viney v. Hughes, supra; O'Dell v. Hanson, 1950, 241 Iowa 657, 42 N.W.2d 86, 89; Eggers v. Mitchem, supra. In Dwight v. City of Des Moines, 1916, 174 Iowa 178, 156 N.W. 336, the plaintiff owned a lot in the City of Des Moines which abutted an unplatted property owned by the city. Prior to plaintiff's acquisition of that lot, his predecessors in title had maintained a fence which was eighteen feet over onto the city's property. When the plaintiff acquired the lot, the fence had been moved over to the true line, but he tried to claim the eighteen foot strip on the theory that his grantor had acquired it by acquiescence. In denying plaintiff's claim, the Court stated (at page 338 of 156 N.W.):

"Acquiescence involves more than the building of the fence at a certain point, and then, after building, acquiescing in it as the true line. One cannot acquiesce in a line created by himself and bind another party to such acquiescence, even though he act in good faith, and believes it to be the boundary line. Acquiescence must be by both parties to make a line by acquiescence."

The Court found that the city had no notice of any claim by plaintiff's predecessors that the fence was a boundary.

In Griffin v. Brown, 1914, 167 Iowa 599, 149 N.W. 833, the plaintiff sought to restrain the defendants from trespassing on plaintiff's lot. The south line of the tract owned by the plaintiff was the north line of the tract owned by the defendants. Plaintiff acquired his lot eight years before the defendants obtained their lot. The plaintiff planted some trees near what he claimed to be the south line of his lot. When the defendants acquired their property they had it surveyed, and pursuant to such survey they started to build a building near what the survey showed to be the north line of their lot. In so doing they were over the line which was claimed by the plaintiff. Defendants' property had been unimproved prior to the time they acquired it. The Court, in holding that there had not been a sufficient showing made that defendants' predecessors in title had acquiesced in the line claimed by the plaintiff, stated (at page 838 of 149 N.W.):

"* * * Acquiescence involves more than the mere establishment of a line by one party, and the taking of possession by him. It involves the idea that the other, with knowledge of the line so established and the possession taken, assents thereto, and this may be shown by his conduct, by his words, or even by his silence. *There must, however, be something in the record to show that the party, charged with acquiescence consented to the act of the other in establishing the line and assuming possession.* * * *" (Emphasis supplied.)

The Iowa Court has often stated that the mere acquiescence in the existence of a fence as a barrier is not sufficient to establish the fence as a boundary line. Rather the acquiescence must be in the fence as a boundary. Petrus v. Chicago, R. I. & P. R. Co., 1953, 245 Iowa 222, 61 N.W.2d 439, 442; O'Dell v. Hanson, 1950, 241 Iowa 657, 42 N.W.2d 86, 89;

Eggers v. Mitchem, 1948, 239 Iowa 1211, 34 N.W.2d 603, 606. In the latter case, the plaintiff and the defendant owned adjoining farms. A creek crisscrossed between the two tracts so as to detach about two acres from the defendant's farm and attach the same two acres to the plaintiff's farm. Plaintiff purchased his land in 1938. Defendant inherited his land in 1947. As far back as 1917 the predecessors in title of the plaintiff and the defendant had agreed to run the fence between the two farms along the curved banks of the creek. This was to avoid the water gaps which would have been created if the fence had been run straight along the true property line. Plaintiff brought an action seeking to establish that the winding fence line had been acquiesced in for a sufficiently long period that it had become conclusively established as the boundary between the two farms, thus attaching the two acres to his farm. The trial court found that the agreement was made for the convenience of the original parties thereto so as to avoid a water gap in fencing and was not intended as a boundary. In affirming, the Supreme Court stated (at page 606 of 34 N.W.2d):

> "Under the record there is substantial testimony upon which it might be found * * * that the question of 'Boundary, as denoting a change of ownership' was not involved and the agreement merely established the fence as a barrier."

In Palmer v. Osborne, 1901, 115 Iowa 714, 87 N.W. 712, the defendant had built a fence on what he believed to be the boundary between his lot and that of plaintiff. This fence was in fact over onto plaintiff's property. Plaintiff's lot was unimproved and grown up with brush. The fence was built around 1878. Plaintiff, a nonresident, purchased the lot in question in 1890 through an agent. The trial court dismissed a suit brought by the plaintiff to quiet in her the title to the land between the defendant's fence and the true line. The Supreme Court reversed on the grounds that any claim of the defendant was of no validity. Be-

cause he was claiming beyond his true line by mistake, adverse possession was not available to him. Although it is not clear that the plaintiff's predecessor in title was also an absentee owner, the Court refused to find acquiescence in the fence, as set out by the defendant, stating (at page 714 of 87 N.W.):

> "* * * the owners of lot 2 [plaintiff's lot] had nothing to do with locating or maintaining it, [the fence as placed by the defendant] and did nothing to indicate acquiescence in it as a line, except remaining silent. Their knowledge is presumptive, not actual * * *"

It is the claim of the defendant that there is a lack of sufficient evidence in the record from which it may be inferred that defendant's predecessors in title had any knowledge that plaintiff and her predecessors were claiming that the fence in question was the boundary between the lots. Defendant urges that the only purpose of the fence in question was to serve as a barrier for keeping in livestock which was kept by the plaintiff and her predecessors. The fence in question was there when the Clements family, which included the plaintiff's husband, John Boyle, moved onto the property in 1919. It is true that the fence served a useful function as a barrier because it was used to contain various types of livestock. The type of fence was changed in 1930 chiefly for the purpose of facilitating the raising of poultry on the Clements property.

It has long been settled in this state that the doctrine of acquiescence works against corporations as well as with natural persons. Helmick v. Davenport, R. I. & N. W. Ry. Co., 1916, 174 Iowa 558, 156 N.W. 736. The defendant itself has never acquiesced in the boundary and repudiated it as soon as it took possession. It is therefore necessary to determine if the evidence shows such acquiescence by defendant's predecessors in title. It is well settled that purchasers of property cannot question a boundary line acquiesced in by predecessors in title for more than ten

years. Johnson v. Trump, 1913, 161 Iowa 512, 143 N.W. 510.

It appears that during the period from 1919 until 1954 the lot now owned by the defendant was owned by a family named Hursh. Actually, until 1946 Mrs. Hursh owned this lot jointly with her sister, Mrs. Garvey, but it was always referred to in the evidence as the "Hursh" property. This lot to the south of the plaintiff's property was rough and unimproved. John Boyle testified that the Hurshes very seldom came there before World War II. Plaintiff relies strongly upon the testimony that each landowner gathered walnuts only on his side of the fence as substantiating her claim that the Hurshes acquiesced in the fence as a boundary between the two lots. There is nothing in the record, however, which indicates at what time this occurred. It has been indicated by other evidence that the Hurshes' gardening on their lot was limited to a few years after World War II. The acquiescence would have to be shown as beginning no later than sometime in 1945 in order to have been for the requisite ten years. Plaintiff also relies upon testimony by John Boyle that in 1930 when he was about to rebuild the fence in question he asked the Hurshes if they would share in the expense. He said they refused because the fence would do them no good. There is nothing in the testimony of Mr. Boyle indicating the circumstances under which this request was made. For this reason, various inferences might be drawn therefrom.

The case presented is an extremely close one. It is the view of the Court, however, that the plaintiff has failed to establish the acquiescence of defendant's predecessors in title by the quantum of proof required by the Iowa Supreme Court. That Court has repeatedly stated that such evidence must be *clear*. Trimpl v. Meyers, 1955, 246 Iowa 1245, 71 N.W.2d 437, 439; De Viney v. Hughes, 1952, 243 Iowa 1388, 55 N.W.2d 478, 480. The effect of this type of an action is to take property from one person and give it to another

Because of this, it would seem that in the case of an absentee owner of an unimproved lot inferences of acquiescence should not be drawn from silence or failure to act in the absence of more convincing proof. It is the holding of the Court that the plaintiff has failed to establish that the defendant or its predecessors have acquiesced in the fence as a boundary between the two lots.

It is ordered that the plaintiff's complaint be dismissed with prejudice and that title to the disputed strip be quieted in the defendant.

The foregoing shall constitute the Findings of Fact and Conclusions of Law under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.